22CA1334 Peo v Vaneck 06-11-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1334
Jefferson County District Court No. 20CR3225
Honorable Jason Carrithers, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee and Cross-Appellant,

v.

Joseph Gabriel Vaneck,

Defendant-Appellant and Cross-Appellee.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE FOX
J. Jones and Dunn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 11, 2026

---

Alexis King, District Attorney, Kevin E. McReynolds, Senior Appellate Deputy
District Attorney, Golden, Colorado, for Plaintiff-Appellee and Cross-Appellant

Megan A. Ring, Colorado State Public Defender, Chelsea E. Mowrer, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant and Cross-
Appellee

¶ 1     Defendant, Joseph Gabriel Van Eck,[1] appeals his various convictions arising from several incidents in which he allegedly sexually assaulted four women.  We affirm in part, reverse in part, and remand the case for a new trial on the charges as to which we reverse.

I.     Background

¶ 2     From April to September 2020, in the Denver metro area, Van Eck approached three of the four victims — S.A., D.F., and M.P. — and asked if they needed rides.  They accepted.  The fourth victim, B.H., testified that Van Eck forcibly dragged her into his car.  All four women testified that Van Eck took them to a trailhead west of Denver and sexually assaulted them.

¶ 3     Van Eck told police he did not sexually assault the women.  He initially said he gave some women rides while he was doing research on Colfax Avenue in Denver and Lakewood for a book he was writing about "the fall of society."  But he testified at trial that he had approached the women seeking prostitution services, they

---

[1] The trial court spelled Van Eck's name as one word, but we use the spelling reflected in the parties' briefs.

had consented, and they later falsely accused him to avoid admitting to illegal conduct or because he did not pay them.

¶ 4      Van Eck was charged with multiple sex-related crimes, multiple kidnapping counts, several crime of violence sentence enhancers, and one count of second degree assault. He was also charged with theft and soliciting prostitution. After trial began, the trial court dismissed all counts related to three additional victims — J.Z., R.M., and K.M. — at the prosecution's request. The trial continued with the counts pertaining to S.A., D.F., M.P., and B.H. The jury largely convicted Van Eck as charged.[2]

¶ 5      On appeal, Van Eck raises several challenges. First, he contends that the warrant authorizing a search of his cell phone was invalid, so the trial court erred by denying his request to suppress evidence obtained from the phone. Second, he asserts that the court erred by refusing to grant a mistrial after the jury heard opening statements and evidence about the dismissed counts for J.Z., R.M., and K.M. Third, he argues that the court erred by

---

[2] The jury found that Van Eck did not use a weapon to assault B.H., and it hung on the kidnapping count and physical force aggravator for D.F.

2

precluding defense counsel from cross-examining the victims about whether they engaged in consensual sex work with him.  Finally, he argues that cumulative error requires reversal and that the trial court erred by adding crime of violence sentence enhancers for two of his sexual assault convictions.  The People cross-appeal, arguing that the court erred by concluding that the prosecution could not introduce a video of Van Eck's sexual encounter with M.P. unless M.P. testified and authenticated the video.[3]

¶ 6    We conclude that parts of the cell phone warrant were invalid, the court erred by denying Van Eck's motion to suppress certain evidence obtained from his phone, and the error was not harmless beyond a reasonable doubt.  Thus, we reverse most of his convictions and remand for a new trial.  Next, we conclude that — even if the trial court applied the wrong legal standard — it did not reversibly err by denying Van Eck's motion for a mistrial.  We also conclude that the court did not err or did not reversibly err by precluding the proffered cross-examination.  We do not address Van Eck's underdeveloped cumulative error argument.  We also do not

---

[3] The prosecution later secured M.P.'s presence at trial, and the video was admitted and played for the jury.

address his challenge to his sentences or the People's cross-appeal, which pertain solely to convictions that we reverse.

## II. The Warrant

### A. Additional Facts

¶ 7     After arresting Van Eck, police drafted a warrant — accompanied by an affidavit from the investigating officer — to search his cell phone. The affidavit summarized interviews with S.A., D.F., K.M., and B.H. and detailed their descriptions of the alleged sexual assaults and interactions with Van Eck. The affidavit also generally described the investigation into Van Eck and summarized the interview with him. Finally, it briefly described the information police wanted from the phone.

¶ 8     The court signed the warrant without modification. It authorized a search of Van Eck's phone for (1) "[a]ny communication through social media platforms related to meeting people on Colfax or acts of sex assault"; (2) "[t]ext messages, [c]all [l]ogs, [and] [c]ontact lists"; (3) "[p]hoto and video files to identify if . . . [he] was taking photos or videos of interactions with possible victims"; (4) "GPS and location data to verify location at time of

reported incidents"; and (5) "[s]ubscriber information to confirm ownership of phone."

¶ 9 The search revealed videos of Van Eck's sexual encounters with M.P. and B.H. M.P. was not discussed in the warrant affidavit. Police identified her after finding the video. Van Eck moved to suppress evidence obtained from his cell phone, arguing that the warrant lacked probable cause and was not sufficiently particular. At a suppression hearing, the trial court — focusing largely on particularity without directly addressing probable cause — concluded that the warrant was valid.

¶ 10 At trial, the prosecution introduced the videos of M.P. and B.H. It also introduced a text message Van Eck sent the day after he allegedly assaulted B.H. The message included a photo of someone (presumably Van Eck) holding cash with the caption, "From last night[']s escapade."

## B. The Warrant's Validity

### 1. Standard of Review and Applicable Law

¶ 11 "A trial court's suppression ruling presents a mixed question of law and fact; thus, '[w]e accept the trial court's findings of historic fact if those findings are supported by competent evidence,

but we assess the legal significance of the facts de novo.'" *People v. Coke*, 2020 CO 28, ¶ 10 (citation omitted). Because Van Eck preserved his arguments that the warrant lacked probable cause and particularity, we review for constitutional harmless error. *See People v. Rodriguez-Ortiz*, 2025 COA 61, ¶ 20 (*cert. granted in part* Feb. 9, 2026). Under this standard, we must reverse unless we are "confident beyond a reasonable doubt that the error did not contribute to the guilty verdict." *Zoll v. People*, 2018 CO 70, ¶ 18 (citation omitted). If there is "'a reasonable possibility that the error might have contributed to the conviction,' the error cannot be harmless and we must reverse." *Id.* (citation omitted).

¶ 12     The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. Specifically, the United States and Colorado Constitutions "prohibit the issuance of a search warrant except upon probable cause supported by oath or affirmation particularly describing the place to be searched and the things to be seized." *Rodriguez-Ortiz,* ¶ 21.

¶ 13     There is probable cause for a search warrant when the supporting affidavit "alleges sufficient facts to allow a person of reasonable caution to believe that contraband or evidence of

6

criminal activity is located at the place to be searched." *Id.* (quoting *People v. Miller*, 75 P.3d 1108, 1112 (Colo. 2003)). To determine whether probable cause exists, we review the totality of the circumstances and consider "whether a fair probability exists that 'a search of a particular place will reveal contraband or other evidence of criminal activity.'" *Id.* (quoting *Miller*, 75 P.3d at 1113)). However, the affidavit must provide "a sufficient nexus between criminal activity, the things to be seized, and the place to be searched." *People v. Kazmierski*, 25 P.3d 1207, 1211 (Colo. 2001). "[V]ague allegations that the defendant engaged in illegal activity without establishing a nexus between the alleged criminal activity and place to be searched cannot establish probable cause." *Id.*

¶ 14    Next, the warrant must contain "a 'particular description' of the things to be seized." *Coke*, ¶ 34 (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)). This requirement guards against "'general warrants,' which permit 'a general, exploratory rummaging in a person's belongings.'" *Id.* (quoting *Andresen*, 427 U.S. at 480). The particularity requirement also requires a nexus between the evidence and the alleged crime; the warrant must be "confined in scope to particularly described evidence relating to a specific crime

for which there is demonstrated probable cause." *People v. Seymour*, 2023 CO 53, ¶ 44 (citation omitted). In the cell phone warrant context, we consider whether there are "specific limitations based on (1) the type of alleged criminal activity; (2) the identity of the alleged victim; and (3) if applicable, the timeframe within which the suspected crime occurred." *Rodriguez-Ortiz,* ¶ 27. Additionally, a supporting affidavit "may cure a warrant's facial lack of particularity if (1) the deficient warrant incorporates the curative affidavit by reference; (2) both documents are presented to the issuing judge or magistrate; and (3) the curative affidavit accompanies the warrant during the execution of the warrant." *Id.* at ¶ 24.

¶ 15   Cell phones present unique challenges in the Fourth Amendment context. *See People v. Davis*, 2019 CO 24, ¶ 17. However, "the general trend of caselaw provides cell phones with more protection, not less." *Id.* The United States Supreme Court has emphasized the pervasive nature of cell phone usage, their "immense storage capacity," and the privacy concerns presented when people "carry a cache of sensitive personal information with them." *Riley v. California*, 573 U.S. 373, 393, 394-95 (2014).

## 2. Analysis

¶ 16    To determine the cell phone warrant's validity, we separately assess each search the warrant authorized.  We first consider whether there was sufficient probable cause for each search and, if so, address whether the warrant's scope was sufficiently particular.

### a.    Social Media Search

¶ 17    First, the warrant authorized police to search for "[a]ny communication through social media platforms related to meeting people on Colfax or acts of sex assault."  The affidavit did not suggest that Van Eck met any of the victims via social media, used social media to contact them, or discussed his sexual activities on social media.[4]  Rather, the affidavit made clear that Van Eck targeted women in person and — with a single exception — he had no prior relationship with them.

¶ 18    The only social media platform the affidavit discussed was Van Eck's Facebook page, which showed photos of him with tattoos that matched S.A.'s description.  The affidavit also said his profile page

---

[4] Indeed, the affidavit indicated that Van Eck gave fake names to two of the women, which undermines any suggestion that he used a social media profile with his real name to contact them.

9

indicated that he had "liked" a pornographic movie and other sexual material — none of which related to rape or sexual assault. Although the affidavit reasoned that using Facebook "to look at sexually themed sites" made it "likely that he also used his phone to view such sites, which may include rape related sites," police did not ask to search the phone's browser history.

¶ 19 Overall, the affidavit lacked evidence that Van Eck used social media to communicate with victims, about victims, or about his sexual activity. Thus, there were not "sufficient facts to allow a person of reasonable caution to believe that contraband or evidence of criminal activity [was] located" in Van Eck's social media communications. *Rodriguez-Ortiz*, ¶ 21 (quoting *Miller*, 75 P.3d at 1112). "[V]ague allegations" that his social media could possibly contain evidence of a crime without any "nexus between the alleged criminal activity and place to be searched cannot establish probable cause." *Kazmierski*, 25 P.3d at 1211. Therefore, the first part of the search warrant is invalid.

### b. Texts, Call Logs, and Contacts

¶ 20 Next, the warrant authorized police to search "[t]ext messages, [c]all logs, [and] [c]ontact lists." The trial court reasoned that,

10

although the language was broad, the investigation suggested that there may have been other victims, and police were "trying to figure out who they might be and how they connect." According to the affidavit, the only victim with whom Van Eck shared his contact information was D.F. However, the affidavit also stated that Van Eck drove away with D.F.'s phone (which had not yet been activated). It did not mention Van Eck exchanging contact information with or contacting other victims but reasoned that because he gave his phone number to D.F., he "likely ha[d] contact information on his phone and communications *with other victims*."[5] (Emphasis added.)

¶ 21 We conclude that this provided probable cause to search Van Eck's call logs, contacts, and text messages for communications about or with alleged and potential victims. However, the warrant's scope went beyond this. Facially, the warrant authorized a search of *all* Van Eck's text messages, and the affidavit did not limit this authorization to messages with or about the victims. *See Rodriguez-Ortiz*, ¶ 24. Instead, the affidavit noted that "[i]t is not

---

[5] The affidavit did not disclose whether police asked the other victims if they exchanged contact information with Van Eck.

uncommon for serial criminals to document their *activities and crimes* with their phone through the use of photos and videos, *which are commonly shared through text messages*." (Emphasis added.) Thus, even with the affidavit's limitation, the warrant authorized a search of *any* text message from *any* date with *any* person in which Van Eck shared photos or videos of his "activities and crimes."[6] This is not sufficiently particular. *See Rodriguez-Ortiz*, ¶ 27; *People v. Herrera*, 2015 CO 60, ¶ 20 (warrant to search "any and all data contained in Herrera's cell phone" for evidence that he owned the phone did not provide sufficient limits); *cf. Perez v. State*, 888 S.E.2d 526, 538-39 (Ga. 2023) (warrant was sufficiently particular where it limited the search to call logs and text messages "that could have shown communications with the victim or other suspects").

¶ 22     And, as we will discuss further, such general assertions about how criminals use their phones do not provide sufficient probable cause. *See, e.g., State v. Baldwin*, 664 S.W.3d 122, 134 (Tex. Crim.

---

[6] Because we conclude that the warrant lacked particularity — even if it sufficiently incorporated the affidavit — we do not address the parties' dispute about whether the warrant properly incorporated the affidavit.

App. 2022) ("[B]oilerplate language about cell phone use among criminals [is not] sufficient to establish probable cause to search a cell phone."); *State v. Keodara*, 364 P.3d 777, 782 (Wash. Ct. App. 2015) ("[B]lanket statements about what certain groups of offenders tend to do and what information they tend to store in particular places . . . [are] insufficient under the Fourth Amendment.").

¶ 23    In sum, the authorization to search Van Eck's texts was not limited to "evidence relating to a specific crime for which there [was] demonstrated probable cause." *Seymour*, ¶ 44 (citation omitted); *see Coke*, ¶ 38 (warrant authorizing search of "all texts, videos, pictures, contact lists, [and] phone records" was unconstitutionally broad).  Accordingly, this part of the warrant is invalid.

### c.    Photos and Videos

¶ 24    The warrant also authorized police to search "[p]hoto and video files to identify if . . . Van Eck was taking photos or videos of interactions with possible victims."  Nothing in the affidavit said the victims reported Van Eck taking photos or videos or even using or discussing his phone (apart from giving D.F. his phone number). Therefore, the only part of the affidavit that could have supplied probable cause for this search was the generalized assertion about

13

how "serial criminals" use their phones to "document their activities and crimes . . . through the use of photos and videos." But as the United States Supreme Court has acknowledged, this behavior is not limited to criminals: "[I]t is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives — from the mundane to the intimate." *Riley*, 573 U.S. at 395.

¶ 25     We conclude that broad, generalized assertions about how criminals use their phones — even when based on an officer's purported training and experience — are generally insufficient to provide probable cause. Although not in the context of a cell phone warrant, a division of this court has concluded that a similarly broad assertion did not supply probable cause to search a home. *People v. Eirish*, 165 P.3d 848, 854 (Colo. App. 2007). In *Eirish*, the only stated basis for searching the home was the affiant's statement that, based on his training and experience, drug dealers commonly keep records "relating to drug dealing[] in locations used as storage facilities." *Id.* at 853. The division explained, "While an officer's 'training and experience' may be considered in determining probable cause, such training and experience cannot substitute for

14

an evidentiary nexus, prior to the search, between the place to be searched and any criminal activity." *Id.* at 854.

¶ 26 And other courts have concluded that general statements about how criminals use cell phones cannot establish probable cause. *E.g.*, *Baldwin*, 664 S.W.3d at 134; *Keodara*, 364 P.3d at 782; *United States v. Banyan*, 791 F. Supp. 3d 388, 395-96 (S.D.N.Y. 2025) (explaining that, beyond broad statements about how criminals use phones, there was "no case-specific evidence even remotely suggesting that there was probable cause to believe that the cellphone contained" photo evidence of the crime); *United States v. Williams*, 813 F. Supp. 3d 503, 523-24 (E.D. Pa. 2025) (finding no probable cause where there was no evidence, beyond a "generalized argument that criminals tend to use phones," that "a cell phone was used in the commission of the actual offenses or observed at any of the crime scenes").

¶ 27 There may be situations in which *specific* assertions about how *certain* criminals use phones in *certain* crimes could provide sufficient probable cause. *E.g.*, *United States v. Silva*, 146 F.4th 183, 193 (2d Cir. 2025) (affidavit discussing gang members' use of phones in a racketeering case "identified specific attributes of the

alleged criminal conduct that tended to show the cell phone would contain evidence of that conduct"). Here, however, the broad statement that serial criminals, like most people, document their activities through photos and videos did not provide probable cause to search the photo and video files in Van Eck's phone. Without some indicia that he took photos or videos (or even used his phone) with the victims, nothing suggested his photo and video files contained evidence of the alleged crimes. *See Rodriguez-Ortiz*, ¶ 21. Accordingly, the part of the warrant authorizing a search of Van Eck's photo and video files is invalid.

d.     GPS and Subscriber Information

¶ 28    Finally, the warrant authorized police to search the phone for "GPS and location data to verify location at the time of the reported incidents" and "[s]ubscriber information to confirm ownership of the phone." We conclude that these parts of the warrant pass constitutional muster.

¶ 29    First, with respect to location data, the affidavit cited case law and a study discussing the ubiquitous nature of cell phone use and ownership in modern society. Police also seized Van Eck's phone upon his arrest. Thus, "the affidavit showed a fair probability that"

16

searching Van Eck's GPS location data "would reveal 'evidence of criminal activity,' such as his physical location at the time of the crimes." *Id. at* ¶ 25 (citation omitted); *see also State v. Evans*, 339 A.3d 1138, 1155 (Conn. 2025) ("Given the inextricable connection between people and their cell phones, an affidavit establishing probable cause that a suspect committed a crime and facts that [he] is known to use or possess a particular cell phone" establish probable cause to search location data.).

¶ 30     The authorization to search the phone's GPS data was also sufficiently particular. First, it was limited to the alleged criminal activity (i.e., the reported incidents). *See Rodriguez-Ortiz,* ¶ 27. Second, because it was limited to the reported incidents, it was also limited to the alleged victims. *See id.* And third, its timeframe was limited to the dates of those incidents. *See id.* Although Van Eck contends that there was no time limitation, the affidavit identified the date of each reported incident.[7] *See id.* at ¶ 24.

---

[7] Even if, as Van Eck contends, the warrant did not sufficiently incorporate the affidavit, any error in introducing the phone's GPS location data was harmless beyond a reasonable doubt because it was undisputed that Van Eck drove the women to the same location, and he did not contest the dates of the incidents.

¶ 31    We reach the same conclusion regarding the warrant's authorization to search the phone's subscriber information to confirm ownership. Police had probable cause to believe Van Eck had committed several crimes and that the phone belonged to him. *See id.* at ¶ 25; *Evans*, 339 A.3d at 1155. And unlike in *Herrera*, ¶¶ 4, 18-21, this warrant did not authorize police to search Van Eck's entire cell phone to confirm ownership information; it was limited to "subscriber information." Finally, even if the warrant did not sufficiently limit where in the phone police could search for subscriber information, police seized Van Eck's phone from him, and he never contested ownership. Therefore, any error in admitting the phone's subscriber information was harmless beyond a reasonable doubt. *See Zoll*, ¶ 18.

### C.    Good Faith and Harmless Error

¶ 32    Having concluded that parts of the warrant were invalid, we next address the People's argument that the good faith exception to the exclusionary rule applies. Van Eck acknowledges that the prosecution raised the good faith exception but contends that because the trial court never addressed it, we cannot consider it on appeal. *See Coke*, ¶ 38 n.4 (declining to address the good faith

18

exception where it had not been *argued* or addressed below).

However, our independent review of the record reveals that the trial

court did — albeit briefly and in the context of a different warrant —

address good faith. It found "that there very well may be a good

faith exception, both as to this search and the cell phone search. I

didn't already articulate that with my cell phone finding, but I think

that would also fit in." Therefore, we will consider the exception.

*See People v. Hagos*, 250 P.3d 596, 618-19 (Colo. App. 2009)

(addressing the good faith exception despite a lack of factual

findings because our review is de novo).

### 1. Standard of Review and Applicable Law

¶ 33    When police obtain evidence in violation of the Fourth

Amendment, the exclusionary rule may require suppression of

evidence discovered as a result of the violation. *People v. Tomaske*,

2019 CO 35, ¶ 10. The exclusionary rule also applies to the "fruit

of the poisonous tree" — evidence that was "later discovered and

found to be derivative of" the illegally obtained evidence. *Id.*

(quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)).

¶ 34    Under the good faith exception, evidence need not be excluded

if, "despite an otherwise invalid warrant, . . . the officer(s) that

executed the warrant had a reasonable good faith belief that the search was in accord with the Fourth Amendment." *People v. Cooper*, 2016 CO 73, ¶ 10; *see* § 16-3-308(4), C.R.S. 2025. However, "[i]f no reasonable officer would have relied upon the warrant, then objective good faith is absent and the good faith exception" does not apply. *Cooper*, ¶ 11 (quoting *Miller*, 75 P.3d at 1113). We review de novo whether an officer's conduct was objectively reasonable. *People v. Webb*, 2014 CO 36, ¶ 15; *Hagos*, 250 P.3d at 619.

¶ 35 There are four situations in which an officer cannot have reasonably relied on an invalid warrant, and we address two of them here. *Cooper*, ¶ 12; *United States v. Leon*, 468 U.S. 897, 923 (1984). First, the good faith exception does not apply if the warrant is "facially deficient" because it "fail[s] to particularize the place to be searched or the things to be seized." *Leon*, 468 U.S. at 923. The exception also does not apply to a warrant based on a "bare bones" affidavit that is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Cooper*, ¶ 12 (quoting *Miller*, 75 P.3d at 1114). "An affidavit is termed bare bones if it contains 'wholly conclusory statements devoid of facts from

20

which a magistrate can independently determine probable cause.'"
*People v. Pacheco*, 175 P.3d 91, 96 (Colo. 2006) (citation omitted).

### 2.    Analysis

¶ 36    Having concluded that the part of the warrant authorizing a search of Van Eck's texts lacked particularity, we also conclude that the good faith exception does not apply. *See Herrera*, ¶ 22 & n.7 (concluding without further analysis that a lack of particularity rendered the good faith exception inapplicable).

¶ 37    Because the exception does not apply, we next consider whether the erroneous admission of Van Eck's texts was harmless beyond a reasonable doubt. *See Zoll*, ¶ 18. The only text message that he challenges is the one in which, the day after his encounter with B.H., he sent a photo of cash with the caption, "From last night[']s escapade." However, Van Eck admitted that he took B.H.'s backpack and placed it by his trash bin when he got home. Police found a backpack in the trash bin when they searched Van Eck's house, and B.H. testified that Van Eck took her backpack, which contained $300 in cash. Van Eck also admitted that he never returned the backpack. Therefore, because he effectively admitted to theft, we conclude that the erroneous admission of the text was

21

harmless beyond a reasonable doubt with respect to his theft conviction. It did not implicate his other convictions. *See id.*

¶ 38    We next address the parts of the warrant that lacked probable cause. Assuming without deciding that the good faith exception did not apply to the search of Van Eck's social media communications, Van Eck does not assert that any such communications were admitted at trial. If this evidence was not admitted, it necessarily could not have contributed to his conviction. *See Zoll*, ¶ 18.

¶ 39    Finally, we address the part of the warrant authorizing a search of Van Eck's photos and videos and conclude that the affidavit was so bare bones that the good faith exception does not apply. *See Cooper*, ¶¶ 11-12. As we have explained, the affidavit provided a "wholly conclusory statement[]" about how serial criminals use cell phones as the basis to search Van Eck's photos and videos. *Pacheco*, 175 P.3d at 96 (citation omitted). The reference to "serial criminals" could just as accurately have been replaced with "most people who own cell phones," and there was no other evidence (or inference) that his photos or videos may have contained evidence of a crime. Thus, we cannot conclude that good faith was present. *See Cooper*, ¶¶ 11-12; *Miller*, 75 P.3d at 1116

22

(declining to apply the good faith exception when there was no link "between the place to be searched and current information of criminal activity or the presence of contraband there").

¶ 40 Accordingly, the videos of M.P. and B.H. should have been suppressed under the exclusionary rule. Additionally, because police identified M.P. after searching Van Eck's videos, all evidence regarding M.P. — including her testimony — should have been suppressed as the "fruit of the poisonous tree." *Tomaske*, ¶ 10 (quoting *Strieff*, 579 U.S. at 237).

¶ 41 Finally, we conclude that the erroneous admission of this evidence was not constitutionally harmless and requires reversal. *See Zoll*, ¶ 18. When the prosecution played the videos of M.P. and B.H., Van Eck started crying. At sentencing, the court said, "[M]y imagination couldn't have equaled the horror that I saw on those videos." The videos of M.P., who was nineteen when Van Eck assaulted her, are particularly harrowing. The first video begins with M.P. clearly crying, saying she wanted to go home multiple times, and she appears to say "no" when Van Eck asks if she "like[d] it." In the second video, Van Eck says, "Don't run," he

repeatedly tells M.P. not to "bite it" (referring to his penis), and at one point says, "If you bite it, I will shoot you."

¶ 42　　Given the videos' graphic nature and the clear implication that the women did not consent, there is a reasonable possibility that they may have contributed to Van Eck's sexual assault and sexual contact convictions for all four victims.[8]  *See id.*; *see also People v. Liebler*, 2022 COA 21, ¶ 21 (we are in the same position as the jury when reviewing video evidence).  Therefore, we reverse Van Eck's convictions for sexual assault, attempted sexual assault, and unlawful sexual contact, and we reverse all his convictions related to M.P.  We remand the case for a new trial on those charges without the improperly obtained evidence.  However, on remand, the prosecution may retry any counts that were not dismissed with prejudice, including the counts on which the jury was hung.  *See People v. Beller*, 2016 COA 184, ¶ 14 ("[A] retrial following a hung jury does not offend the Double Jeopardy Clause.").

---

[8] The People do not address whether the videos' admission was harmless.  *See People v. Zimmer*, 2021 COA 40, ¶ 39 (it is the People's burden to prove harmless error).

¶ 43    We recognize the particularly brutal nature of the crimes involved here, but "[o]ur Constitution insists . . . that no matter how heinous the crime, any conviction must be secured respecting all constitutional protections." *Shinn v. Ramirez*, 596 U.S. 366, 393, (2022) (Sotomayor, J., dissenting).  Because that did not happen here, we must reverse.

## III.   The Dismissed Counts

¶ 44    Van Eck next contends that the court erred by refusing to grant a mistrial after the jury heard opening statements and evidence about the dismissed counts related to three alleged victims.  He also contends that the court erred by refusing to strike evidence related to K.M.  We conclude that the court did not err or did not reversibly err.

## A.    Additional Facts

¶ 45    As discussed, after trial began, the court dismissed all counts related to J.Z., R.M., and K.M.  However, the jury learned of these victims before the counts were dismissed.  First, during voir dire, the trial court read the various charges and named all seven original victims.  The court then told the jury that the allegations were not evidence or proof of a crime, and it instructed the jury not

to assume that Van Eck committed a crime based on the charges, number of allegations, or number of victims. During voir dire, the parties' attorneys repeatedly said there were seven victims.

¶ 46 In opening statements, the prosecutor briefly described the allegations pertaining to J.Z., explaining that she and Van Eck dated in 2014, and Van Eck forced her to have sex with him. The prosecutor then described R.M.'s sexual assault allegations while R.M. was Van Eck's wife. Finally, the prosecutor explained that Van Eck pulled K.M. into his car, drove her to the mountains, grabbed her neck, put her in a headlock, kicked her out of the car, and drove away. R.M. and J.Z. were not discussed again, but additional evidence was presented about K.M.

¶ 47 Specifically, an officer testified that he responded to the alleged kidnapping and assault involving K.M. The court gave a limiting instruction telling the jury to consider the allegations not for their truth but to understand the officer's investigation. The court also limited the scope of the officer's testimony to the fact that he met with K.M. and what he did next, but it precluded any testimony about K.M.'s statements. The officer then explained that he took pictures of K.M., the prosecution introduced the photos,

and the officer testified that he took a photo of K.M.'s neck (where she said she was assaulted). Two other officers described searching the area where Van Eck took K.M. and testified that they found one of K.M.'s socks. Finally, an officer testified that he asked B.H. if she was attacked because the circumstances she described were similar to K.M.'s statements.

¶ 48 On the seventh day of trial, the court granted the prosecution's motion to dismiss the J.Z. and R.M. counts because the prosecution was concerned it would not have time to present the evidence. The defense neither objected nor requested a mistrial. The next day, the prosecution moved to dismiss the K.M. counts. Defense counsel moved for a mistrial, arguing that no limiting instruction could cure the prejudice from the jury hearing evidence about the three dismissed victims.

¶ 49 The court ultimately denied the request after concluding that (1) the prosecution had not acted in bad faith by presenting opening statements and some evidence about the counts it later sought to dismiss, and (2) there was no manifest prejudice to Van Eck. It also declined to strike evidence relating to K.M. The court twice instructed the jury not to consider references to the dismissed

27

counts or those victims, and it reiterated that voir dire and opening statements were not evidence. It also instructed the jury to consider each count separately.

### B. Standard of Review and Applicable Law

¶ 50 As "the most drastic of remedies," a mistrial "is warranted only when the prejudice to the defendant is too substantial to be remedied by other means." *People v. Owens*, 2024 CO 10, ¶ 125 (citation omitted). "Because the trial court is in a better position to evaluate any adverse effect of improper statements or testimony on a jury, it has considerable discretion to determine whether a mistrial is warranted." *People v. Williams*, 2012 COA 165, ¶ 13 (citation omitted). We will not disturb the trial court's decision "absent a gross abuse of discretion and prejudice to the defendant." *Owens*, ¶ 125. A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. *Williams*, ¶ 13.

¶ 51 Generally, the erroneous admission of evidence "may be cured by withdrawing the evidence from the jury's consideration and instructing the jury to disregard it." *Owens*, ¶ 127 (citation omitted). Absent evidence to the contrary, we presume that the jury followed a court's curative instructions. *Id.* at ¶ 128.

¶ 52     We also review a trial court's decision not to strike evidence for an abuse of discretion. *People v. Rodriguez-Morelos*, 2022 COA 107M, ¶ 37, *aff'd*, 2025 CO 2.

¶ 53     We review nonconstitutional preserved errors for harmless error. *Hagos v. People*, 2012 CO 63, ¶ 12. Under this standard, we reverse if an error affected the defendant's substantial rights, meaning that it "substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* (citation omitted). We review unpreserved errors for plain error. *Id.* at ¶ 14. Plain error must be obvious, and "[w]e reverse under plain error review only if the error 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *Id.* (citation omitted).

### C.    The Mistrial Ruling

¶ 54     Van Eck first contends that the trial court applied the wrong legal standard to determine whether a mistrial was warranted.[9] We

---

[9] We agree with the People that Van Eck did not preserve his argument that the trial court applied the wrong legal standard. Although he stated the correct standard, he never objected to the court's determination under the bad faith and manifest prejudice standard. However, we reject the People's argument that this constituted invited error.

conclude that — even if the court erred — any error was not plain because the standard the court applied overlapped with the correct legal standard. *See id.*

¶ 55    The court's decision not to grant a mistrial appears to have been based on the principle that prosecutors must limit their opening statements to facts they later intend to prove at trial, and "[r]emarks later proved to be unsupported by the evidence will ordinarily constitute reversible error if there has been an affirmative showing of bad faith and manifest prejudice." *People v. Lovato*, 2014 COA 113, ¶ 61 (citation omitted). Here, it is not that the references to K.M., J.Z., and R.M. were *unsupported*, they were simply no longer appropriate for the jury's consideration once the counts related to these victims were dismissed. And this standard applies only to opening statements, not to the evidence presented about K.M.

¶ 56    However, the standard the court used and the appropriate mistrial framework both consider whether the defendant was prejudiced by the remarks or the evidence. *See Owens*, ¶ 125. And the court fully addressed and rejected Van Eck's argument

regarding the potential prejudice. Therefore, any error did not rise to the level of plain error.

¶ 57 Next, Van Eck contends that a mistrial was warranted because the prejudice could not be remedied by a curative instruction. *See id.* We disagree. As to the remarks during opening statements and voir dire about the seven victims and the later dismissed charges, the jury was repeatedly instructed that opening statements and voir dire were not evidence. Because there was no evidence to the contrary, we presume that it followed these instructions. *See id.* at ¶ 128. And after the counts for the three victims were dismissed, four victims remained. It is not as if the jury heard about seven alleged victims and the counts for all but one or two were dismissed. As such, we cannot say that there was a significant difference in the prejudicial nature of four versus seven victims.

¶ 58 We also reject Van Eck's argument that the difference between the circumstances of the dismissed allegations and those of the other four victims increased any prejudice. Although R.M.'s and J.Z.'s allegations concerned events that occurred years prior and in the context of a relationship with Van Eck, the jury heard no testimony about them. And the prosecutor referenced the specific

allegations only briefly in opening statements. *See People v. Salas*, 2017 COA 63, ¶ 12 (reasoning that brief references are less prejudicial).

¶ 59    With respect to K.M., the trial court specifically limited the officer's testimony to his investigatory steps and told the jury to consider K.M.'s allegations in this context and not for their truth. Although Van Eck highlights the fact that K.M.'s allegations were different from those of the remaining victims because her case did not involve an alleged sexual assault, this minimized, rather than increased, any potential prejudice. *Cf. People v. Brown*, 2014 COA 130M, ¶ 22 (inadmissible evidence about uncharged misconduct was prejudicial because it was "more severe[] and more inflammatory than the evidence concerning the charged offenses"). And the fact that the jury hung on several charges suggests that it followed the court's instructions and was not swayed by prejudice. *See People v. Larsen*, 2017 CO 29, ¶ 16 (noting that "a split verdict is an indication that prejudice did not affect the jury's verdict" (citing *Martin v. People*, 738 P.2d 789, 795-96 (Colo. 1987))).

¶ 60    Finally, there was significant evidence of Van Eck's guilt. Even absent the three dismissed victims, the jury heard evidence

from four victims recounting a nearly identical pattern of assaults. Van Eck argues that the case was close because it rested on the victims' credibility, but the number of victims and consistency between their accounts undermine this argument.

¶ 61 Overall, we cannot conclude that the prejudice was so substantial that it could not be remedied by the court's limiting instruction such that a mistrial was warranted. *See Owens*, ¶ 125.

D. Refusal to Strike Testimony and Evidence

¶ 62 Finally, Van Eck contends that the trial court reversibly erred by refusing to strike the testimony and evidence regarding K.M. We conclude that, even if the court erred, any error was harmless. The evidence about K.M. that the jury heard largely related to the location of the incident, the officers' attempts to locate and identify Van Eck, and their attempts to corroborate K.M.'s presence at the scene. An officer briefly mentioned that he responded to a kidnapping and assault, but the court contemporaneously instructed the jury not to consider that evidence for its truth. The court also instructed the jury not to consider voir dire, opening statements, "or *references* to other charges or alleged victims," and

33

it reminded the jury to consider each charge separately. (Emphasis added.)

¶ 63 Given the court's curative instructions and the admissible evidence relating to the four remaining victims, we cannot conclude that the testimony about K.M. substantially influenced the jury's verdict. *See Hagos*, ¶ 12; *see also Zapata v. People*, 2018 CO 82, ¶ 67 (concluding that an error was harmless where there was strong evidence of guilt).

## IV. Cross-Examination About Prostitution

¶ 64 Van Eck next argues that the trial court erred by refusing to allow him to cross-examine the victims about whether they engaged in consensual prostitution with him. He asserts that this violated his constitutional right to present a defense and to cross-examine witnesses. He also contends that the court's ruling violated his right to remain silent by forcing him to testify. We conclude that the court either did not err or did not reversibly err.

## A. Additional Facts

¶ 65 Before trial, Van Eck moved to admit certain evidence under the rape shield statute. *See* § 18-3-407, C.R.S. 2025. As relevant here, he sought to admit the fact that the alleged victims were sex

workers as "necessary context for jurors." In an attached affidavit, he contended that, pursuant to discovery, the complaint, and the prosecutor's pretrial arguments, five of the seven original victims "were all self-employed as sex workers on the date of the offense." At a pretrial hearing, the prosecutor had referred to the women as "prostitutes" or "single mothers" or being "in a [vulnerable] position where [Van Eck] [was] threatening to deport them."

¶ 66 At a hearing on the motion, defense counsel said that one victim "would fully self-identify as being a sex worker," but the others were not as explicit. When the court asked for evidence that the victims engaged in prostitution with Van Eck, defense counsel said that sex workers typically use vague terms such as "working" and are hesitant to admit the fact to law enforcement, so the inference comes from "the location [and] the people who they are working with." For example, defense counsel asserted that S.A. was staying with a "working girl." At a later hearing, defense counsel said B.H. told police she was a sex worker, and the prosecutor acknowledged that B.H. said this in body camera footage and that her criminal record had "entries for prostitution." The court found

that defense counsel had not made a sufficient offer of proof under the rape shield statute to ask if the victims were sex workers.

¶ 67 At trial, S.A. testified three times that she told Van Eck she was not a sex worker. After S.A. testified, the prosecutor asked the court to revisit its prior ruling precluding inquiry into whether the victims were sex workers, and the court reiterated that there was not a sufficient offer of proof and no good faith basis to ask those questions. Defense counsel offered to discuss its good faith basis with the court ex parte.

¶ 68 Defense counsel then filed a written objection to the court's limitation on the proposed cross-examination. The court denied Van Eck's request to make a midtrial, ex parte offer of proof. The court also explained that it was not necessarily operating under the rape shield statute but was requiring at least a good faith basis and offer of proof.

¶ 69 The court later reiterated that it needed a good faith basis and an offer of proof before it would allow the proffered questions. Defense counsel argued that an offer of proof was not required because the questions went directly to Van Eck's defense and the victims' biases or motives. Counsel also asked to limit the inquiry

36

to "the night of" the incidents, not the victims' history of sex work. Again, the court asked for a good faith basis, and defense counsel said B.H. had admitted she was a sex worker in New Mexico and Colorado, and Van Eck visited an ATM the night of one of the assaults. Again, the court found this offer insufficient.

¶ 70 Ultimately, Van Eck decided to testify. Defense counsel asserted that his decision was based on the court's ruling precluding cross-examination about whether the victims "were actively engaged in prostitution on the night of these events." Van Eck testified that the victims engaged in consensual prostitution with him.

### B. Standard of Review and Applicable Law

¶ 71 "The scope and limits of cross-examination are matters within the sound discretion of the trial court." *People v. Conyac*, 2014 COA 8M, ¶ 91. Generally, we review a trial court's ruling on cross-examination for an abuse of discretion. *Id.* However, "it is constitutional error to limit excessively a defendant's cross-examination." *Id.* at ¶ 92. "If cross-examination is erroneously and excessively limited," we review for constitutional harmless error and reverse unless the error is harmless beyond a reasonable doubt. *Id.*

"An erroneous evidentiary ruling may rise to the level of constitutional error if it deprived the defendant of any meaningful opportunity to present a complete defense." *Id.* at ¶ 93. But this occurs only "where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *Id.* If the defendant was not so deprived, we review only for nonconstitutional harmless error. *Id.* at ¶ 94.

¶ 72 Under the rape shield statute, a witness's or victim's "prior or subsequent sexual conduct" is presumed irrelevant except under limited circumstances not applicable here. § 18-3-407(1). To overcome this presumption of irrelevance, the party seeking to introduce evidence of prior or subsequent sexual conduct must follow specific procedures, including filing a written motion with an affidavit stating the offer of proof and participating in an in camera hearing. § 18-3-407(2)(a)-(e).

¶ 73 However, even absent the rape shield statute's mandates, "[q]uestions directed toward impeaching a witness must be asked in good faith." *People v. Pratt*, 759 P.2d 676, 684 (Colo. 1988); *see also People v. Vialpando*, 804 P.2d 219, 223 (Colo. App. 1990) ("Defense counsel may not properly propound to a witness

questions which can cause a doubt in the jury's mind as to the witness' credibility when there is no reasonable basis in fact for that interrogation."); *People v. McFee*, 2016 COA 97, ¶ 64 (no abuse of discretion in precluding questions where the defendant "did not present a good faith basis to ask the question"). Finally, under CRE 103(a)(2), we will not find error from a ruling that excludes evidence unless — as relevant here — "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

### C. Analysis

¶ 74 First, we conclude that the trial court erred to the extent that it precluded the challenged cross-examination under the rape shield statute. On appeal, Van Eck challenges only the precluded examination about whether the victims engaged in prostitution with him during the alleged assaults. The rape shield statute applies to "prior or subsequent sexual conduct," not to sexual conduct that was part of (or led to) the charged offense. § 18-3-407(1); *see also State v. Jones*, 230 P.3d 576, 581 (Wash. 2010) (precluding evidence of sexual conduct on the night of the alleged incident would "effectively read[] the word 'past' out of the [rape shield]

39

statute"). The trial court's reliance on *People v. Bray*, 879 P.2d 410 (Colo. App. 1993), was misplaced. There, the defendant sought to introduce evidence of the victim's *subsequent* acts of prostitution with someone other than the defendant. *Id.* at 415-16. Here, by contrast, Van Eck sought to elicit that the victims engaged in consensual prostitution with him at the time of the alleged incidents. Thus, the rape shield statute did not apply.

¶ 75   However, because the court indicated that its ruling was not necessarily (or solely) predicated on the rape shield statute, we consider whether the challenged testimony was otherwise inadmissible with respect to each victim. We do not consider the admissibility of the evidence related to M.P. because we have already reversed all Van Eck's convictions pertaining to her.

¶ 76   As to S.A., she testified multiple times that she told Van Eck she was "not a hooker" and said, "If he would have asked me if I was a working girl, I would have said hell no. I never would have got into his truck." Van Eck does not point to what additional evidence he was precluded from eliciting. And because she denied being a sex worker, there was no reason to explicitly ask if she

engaged in prostitution with Van Eck on the night in question. Therefore, we perceive no error.

¶ 77 Next, as to D.F., Van Eck offered no evidence that she was a sex worker at any point, including on the night of the assault. On appeal, Van Eck emphasizes that the women got into his truck voluntarily late at night, they did not work regular jobs or were unemployed, and they were unhoused. He also argues that D.F. called him her "date," which he asserts is a common term for prostitution. But not only was this not part of his offer of proof, the trial court asked D.F. what she meant by a "date," and she said, "When you go with somebody and you go out to eat, you know, you go and you just get to know them and you[] just go on a date."

¶ 78 Even if an offer of proof was not required under the rape shield statute, defense counsel needed a good faith basis to ask the challenged questions. *See Vialpando*, 804 P.2d at 223; *McFee*, ¶ 64. Here, there was no good faith basis to believe that D.F. was a sex worker in general or was engaged in sex work on the night in question. The mere fact that she was walking late at night in an area known for prostitution and lacked stable housing or a steady income was insufficient. Therefore, Van Eck failed to show that he

41

had a good faith basis to cross-examine D.F. about whether she engaged in prostitution with him, and the court did not err by precluding this inquiry.

¶ 79 We also reject Van Eck's contention that the court should have allowed him to make an ex parte offer of proof. He cites no controlling authority for the proposition that he was entitled to an ex parte hearing or that the court erred by prohibiting one. And the case he cites in support of his argument is distinguishable. In *People v. Kilgore*, 2020 CO 6, ¶¶ 28-29, the court held that a trial court erred by compelling the defendant to disclose his exhibits before trial. The supreme court reasoned that Crim. P. 16 did not require the disclosure. *Kilgore*, ¶ 26. Thus, while it concluded that the disclosure order improperly compelled the defendant to share his trial strategy and defense, its reasoning was also predicated on the absence of a rule requiring such disclosure. *Id.* at ¶ 29.

¶ 80 Conversely, ex parte communications are explicitly prohibited. "[T]rial judges must take great care to avoid ex parte communications with a party, attorney, or individual affiliated with a party concerning pending judicial proceedings." *Wilkerson v. Dist. Ct.*, 925 P.2d 1373, 1377 (Colo. 1996); *see also* C.J.C. 2.9(A)

(prohibiting judges from having ex parte communications except under limited circumstances or with the parties' consent).  Because the prosecution did not consent and none of the exceptions to the prohibition on ex parte communications applied, the court did not err by denying Van Eck's request.

¶ 81     Finally, we turn to B.H.  Both parties told the court that B.H. admitted to engaging in sex work.  The trial court concluded that this did not provide a good faith basis to ask whether she was engaged in sex work with or offered sex work to Van Eck.  We disagree.  We do not think that Van Eck had to establish that B.H. was engaged in sex work on the night in question to ask whether she engaged in sex work with Van Eck.  This would impose a much higher burden than a good faith basis demands.  The recorded admission that she was a sex worker constituted a sufficient good faith basis to ask if she engaged in sex work with Van Eck on the night in question.  To conclude otherwise would require parties to have near definitive proof of the answer to every question before asking it.  A good faith basis is not such a high bar.

¶ 82     However, we reject Van Eck's contention that this error denied him an opportunity to present a complete defense or to effectively

43

cross-examine the witness. First, he testified that the women consented to the sexual contact and were sex workers whom he solicited for prostitution, and the jury was instructed on his consent defense. *See People v. Lanari*, 926 P.2d 116, 122 (Colo. App. 1996) (the defendant was not precluded from presenting a defense when he testified in support of his defense, and the jury was instructed on the defense). And Van Eck's failure to make a sufficient offer of proof to elicit the precluded testimony was not an error attributable to the court. *See Vialpando*, 804 P.2d at 222 (the defendant was not denied a fair trial when he failed to make adequate offers of proof).

¶ 83    But even assuming that the error in restricting B.H.'s cross-examination is reviewable for constitutional harmless error, we conclude that the error was harmless beyond a reasonable doubt. We have already reversed Van Eck's sexual assault conviction related to B.H., and the jury did not receive a kidnapping count for her. Therefore, the only relevant convictions are the conviction for theft and the conviction for soliciting prostitution. Whether B.H. and Van Eck's encounter began as consensual prostitution was irrelevant to his theft conviction. As to the solicitation conviction,

even if Van Eck had not testified, the defense theory from opening statements through closing argument was always that Van Eck's encounter with all the women was consensual prostitution. In light of this consistent theme, it is very unlikely that cross-examining B.H. about whether she engaged in prostitution with Van Eck would have changed the result.

¶ 84 For similar reasons, we conclude that Van Eck was not forced to choose between exercising his right not to testify and his rights to cross-examination and to present a complete defense. We already addressed his insufficient offer of proof, which he was not entitled to make ex parte. He made a strategic decision to testify rather than making his offer of proof in front of the prosecution, but that resulted from his choices, not the court's error. And although he made a sufficient offer of proof regarding B.H., we cannot conclude that the court's evidentiary ruling unconstitutionally compelled his testimony. *See United States v. Caira*, 737 F.3d 455, 460-61 (7th Cir. 2013) (rejecting a nearly identical argument "because the defendant retains the option of standing on his right not to testify and seeking appellate correction of the evidentiary ruling"); *State v.*

*Rivera*, 2014 WI App 110, ¶ 30 ("'[A] defendant is not compelled to testify in the face of an evidentiary error.").

## V.    Cumulative Error

¶ 85    Finally, we do not review Van Eck's contention that cumulative error requires reversal.  In two sentences, he states the standard of review and asserts that "[a] new trial is required because the aggregate impact of numerous errors . . . deprived [him] of a fair trial."  Because this argument is underdeveloped, we do not consider it.  *See People v. Simpson*, 93 P.3d 551, 555 (Colo. App. 2003).

## VI.    Remaining Issues on Appeal

¶ 86    We do not address Van Eck's challenge to his sexual assault sentences because we reverse the underlying convictions.  We also do not address the People's cross-appeal, which relates to the video of M.P. that is inadmissible on retrial.

## VII.   Disposition

¶ 87    We reverse Van Eck's sexual assault convictions (counts 1, 4, and 11), his kidnapping and solicitation convictions related to M.P. (counts 12 and 13), and his convictions for attempted sexual assault and unlawful sexual contact as to D.F. (counts 8 and 9).

We affirm his remaining convictions.  We remand the case for a new trial consistent with this opinion.

JUDGE J. JONES and JUDGE DUNN concur.